UNITED STATES of America,
Plaintiff-Appellee,

v.

Alex KING, Jr., Defendant-Appellant.

No. 79–1159.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 5, 1979.

Decided Jan. 18, 1980.

Kimball Anderson, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, U.S. Atty., Antonio J. Curiel, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before TONE and WOOD, Circuit Judges, and DUMBAULD, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant-appellant Alex King, Jr., was convicted on four counts of making false statements in furtherance of his application for Supplemental Security Income (SSI) in violation of 18 U.S.C. § 1001.[1] The sequence of events leading to his convictions

---

* The Honorable Edward Dumbauld, Senior District Judge of the United States District Court for the Western District of Pennsylvania, is sitting by designation.

1. 18 U.S.C. § 1001 provides:
Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

began when King, then a postal worker, was disabled with a job-related injury in June 1972. Commencing immediately thereafter he received sick pay from the Postal Service, which continued through November 1972. From that time through July 1973 he received state welfare payments. In the interim, King filed for and received workmen's compensation payments from the Postal Service, which continued until commencement of his trial in January 1979. King also received SSI payments in the amount of $1957 from March 1975 through March 1976.

Count I arises from King's original application for SSI. On December 5, 1974, King went to a local Social Security Administration (SSA) office for an eligibility interview. Consistent with standard SSA procedure, a claims representative prepared an "Application for Supplemental Security Income," which reflected King's statement that he had received no workmen's compensation during that month and did not anticipate receiving any within the next fourteen months. King read and signed the application.

Count II refers to a telephone interview between King and another claims representative on September 12, 1975. Based on that conversation the claims representative reported on Government Form 5002 that King claimed the SSI payments, which had commenced six months earlier, were his sole source of income. A redetermination interview conducted on February 25, 1976, forms the basis of Count III. During that interview a claims representative prepared Form

8200, entitled "Statement for Determining Continuing Eligibility for Supplemental Security Income Payments," which King read and signed. This form also indicated that King had answered in the negative the questions whether he received workmen's compensation payments during that month and whether he expected to receive any within the next fourteen months.

The basis of Count IV is an interview with King on October 13, 1976. Before this interview King was advised of his *Miranda* rights, acknowledged that he understood them, and consented to being interviewed without having an attorney present. The claims representatives prepared an SSA form entitled "Voluntary Statement to Explain Irregularity," which contained King's answers to the questions posed during the course of the interview. It reflected that King claimed he received no monthly cash payments or income of any kind other than SSI. One of the claims representatives read this statement aloud to King and then asked him if it contained any inaccuracies. Upon examining the form and finding none, King affixed his signature to it, and both claims representatives signed as witnesses.

At trial, the SSA forms filled out by the claims representatives were admitted into evidence under the business records exception to the hearsay rule. Fed.R.Evid. 803(6).[2] King asserts this was error. He argues that because the forms are also public records their admissibility is governed by the exception to the hearsay rule provided in Fed.R.Evid. 803(8).[3] This latter excep-

---

2. Fed.R.Evid. 803(6) provides:
   Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, as-

sociation, profession, occupation, and calling of every kind, whether or not conducted for profit.

3. Fed.R.Evid. 803(8) provides:
   Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an in-

tion to the hearsay rule contains exclusions in criminal cases for reports of "matters observed by police officers and other law enforcement personnel," *id.* 803(8)(B), and of "factual findings resulting from an investigation made pursuant to authority granted by law . . . ." *Id.* 803(8)(C).[4] To complete his argument, defendant points to the legislative history of Rule 803(8), which reveals a congressional intent that under certain circumstances documents within the ambit of the Rule 803(8)(B) & (C) exclusions are inadmissible under any other exception to the hearsay rule. *See United States v. Oates,* 560 F.2d 45 (2d Cir. 1977).

■ Assuming for the moment King's assertion that the SSA forms fall within the Rule 803(8)(C) exclusion, we disagree that their admittance as business records under Rule 803(6) is precluded. Our reading of the legislative history indicates that the exclusions arose from a congressional concern that police and other investigative reports would be admitted in lieu of requiring actual testimony by the police officer or investigator. 99 Cong.Rec. H564 (Feb. 6, 1974) (remarks of Rep. Dennis). Underlying this concern is recognition of the relative unreliability of such reports compared to direct testimony of the authoring officer or investigator. Where the author does not testify, congressional intent would be thwarted if the reports were admitted under another hearsay exception. Consistent with this reading of congressional intent, we held in *United States v. Sawyer,* 607 F.2d 1190 (7th Cir. 1979), that the recorded recollections of a law enforcement officer who testified at trial were admissible under Rule 803(5) notwithstanding their inadmissibility under Rule 803(8)(B). The accompanying testimony of the author minimizes the danger of unreliability by giving the trier of fact the opportunity to weigh his credibility and consider the circumstances surrounding preparation of the report. *Sawyer* controls King's argument on this issue; we hold accordingly that because the claims representatives who filled out the admitted forms testified at trial, the arguable applicability of the Rule 803(8)(C) exclusion does not preclude admissibility under another exception to the hearsay rule.

Here, the exception was Rule 803(6). The SSA forms were kept in the ordinary course of its business; they were prepared at or near the time of the interviews of King; and regular SSA practice was to complete the forms when determining an applicant's eligibility for SSI payments. The government presented each of the foregoing facts as a foundation on which to admit the forms as business records under Rule 803(6), and the district court properly admitted them. King is unable to point to any evidence that the forms have even the slightest taint of unreliability or that a greater danger of unreliability is inherent in business records than in recorded recollections.

■ King next contends that the admission of the SSA forms was at the expense of his sixth amendment right of confrontation. Although evidence may be admissible under an exception to the hearsay rule yet still violate the confrontation clause, *California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), such violations occur only on rare occasions. *United States v. Carlson,* 547 F.2d 1346, 1356 (8th Cir. 1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).

■ Confrontation rights are not violated where the out-of-court declarant testifies at trial and is subject to cross-examination. *California v. Green,* 399 U.S. at 155–62, 90 S.Ct. 1930; *United States v. Sawyer,* 607 F.2d at 1194 (Swygert, J., concurring). Even assuming for the moment that cross-examination of the claims representatives

---

vestigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

4. The Rule 803(8)(C) exclusion is inapplicable "in civil actions and proceedings and against the Government in criminal cases . . . ." Items within the ambit of Rule 803(8)(C) are therefore inadmissible under that rule only when admission is sought in a criminal case for use against a defendant. *See* note 3 *supra.*

was ineffective because of their inability to remember the details of the interviews, as King urges, *but see id.* at 1194–95, his confrontation rights were not infringed under the criteria of reliability set forth in *Dutton v. Evans,* 400 U.S. 74, 88–99, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). Although the claims representatives lacked personal knowledge of the matters asserted in the reports, the pertinent information in the SSA records contain no assertion about past facts. Rather, the records show only that King claimed during the interviews that he was not receiving workmen's compensation or other income from any source. Further, the possibility that the records were founded on faulty recollection is extremely remote since all records were made during the interviews or immediately thereafter. Finally, the circumstances surrounding the making of the records were such that misrepresentation was unlikely. All of the claims representatives held responsible positions, and all regularly conducted similar interviews for the purpose of determining the SSI eligibility of other applicants. Under these circumstances, there being little danger of unreliability, the admission of the government exhibits did not infringe King's rights under the confrontation clause.

■ King next asserts that the government did not meet its burden of proving beyond a reasonable doubt that he knowingly made a false statement of material fact. *United States v. Weatherspoon,* 581 F.2d 595, 601 (7th Cir. 1978). Viewed in the light most favorable to the government, the evidence before the district court paints the following picture: The SSA claims representatives when interviewing King were seeking information about any sources of income that King might have had; King was aware that the claims representatives were seeking this information for the purpose of determining his eligibility for SSI payments; King was receiving workmen's compensation from the Postal Service; and when specifically asked whether he was receiving workmen's compensation or any other income answered in the negative. The district court simply found implausible King's explanation that he did not know the

claims representatives were referring to the workmen's compensation that he received from the Postal Service. Under the evidence presented, which included documentary evidence that King made the false statements alleged in each count and testimony supporting the allegations of Counts II, III, and IV, the district court's judgment of conviction was not clearly erroneous.

■ Nevertheless, King argues that his convictions under Counts II, III, and IV cannot be sustained because the underlying false statements were "mere negative responses to questions propounded to him by an investigating agent during a question and answer conference, not initiated by the appellant." *Paternostro v. United States,* 311 F.2d 298, 305 (5th Cir. 1962). King's argument, however, misconstrues the scope of the "exculpatory no" doctrine, which stands as a very limited exception to section 1001. Our reading of the case law indicates that the doctrine is limited to simple negative answers, *id.,* without affirmative discursive falsehood, *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974), under circumstances indicating that the defendant is unaware that he is under investigation, *United States v. Bush,* 503 F.2d 813 (5th Cir. 1974), and is not making a claim against, or seeking employment with the government. *See United States v. Schnaiderman,* 568 F.2d 1208 (5th Cir. 1978).

■ Applying the foregoing limitations to Counts II, III, and IV, we find the doctrine inapplicable. Counts II and III are based on interviews conducted by SSA claims representatives for the purpose of determining whether King was eligible for the SSI payments he was receiving. The interviews were part of the regular procedure SSA used to verify the eligibility of claimants seeking or receiving benefits. There is no evidence that the claims representatives were conducting a fraud investigation at the time of the interviews that form the bases of these counts. But even assuming that they were, the "exculpatory no" doctrine is inapplicable where, as here,

the defendant initiated the contact with the government for the purpose of making a statutory claim for benefits. *See id..* at 1212.

 *Schnaiderman* also precludes the "exculpatory no" doctrine as a defense to Count IV. In addition, that count presents an alternative bar to the applicability of the doctrine. At the time of the interview, the claims representatives had focused a fraud investigation on King. Accordingly, they read King his *Miranda* rights before asking him to attest to the fact that he had no other source of income. King acknowledged that he understood his rights and agreed to answer questions without having an attorney present. Under these circumstances, it is clear that King knew that he was under investigation. This is not a case like *United States v. Bush,* supra, in which the government unsuccessfully sought to apply section 1001 to a defendant who gave simple negative exculpatory answers to questions posed pursuant to an investigation of someone else. *See United States v. Johnson,* 530 F.2d 52 (5th Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976).

Lastly, King asserts the trial judge erred as a matter of law in denying his motion to suppress the statements made to SSA. In light of our finding that only the Count IV interview was conducted pursuant to a fraud investigation focused on King, we find no error in the trial judge's action. Notwithstanding the noncustodial nature of the interview that forms the basis of that count, the claims representatives informed King of his constitutional rights before questioning him. King is unable to point to any evidence that might raise even the most tenuous question of voluntariness.

AFFIRMED.