UNITED STATES of America

v.

Shirley BARRETT.

Crim. No. 86–4–2.

United States District Court,
D. Vermont.

July 18, 1986.

Donald P. Moroz, Asst. U.S. Atty., Burlington, Vt., for U.S.

Marianne L. Marshall, Swanton, Vt., for defendant.

COFFRIN, Chief Judge.

Defendant Shirley Barrett was indicted on multiple charges, including knowingly making a false statement on October 30, 1984 to an agent of the Bureau of Alcohol, Tobacco and Firearms in violation of 18 U.S.C. § 1001 (1982). With the approval of the court and the consent of the government, the defendant waived a jury trial. The matter was heard by the court on April 30, 1986. The findings of fact and conclusions of law are set forth below.

## FINDINGS OF FACT

1. On October 2, 1985 Charles Barrett, a convicted felon and Vermont State parolee, and defendant,[1] his former wife, purchased a shotgun from the Woolworth Department Store in St. Albans, Vermont.

2. Woolworth employee, Zeke Cyr, sold the gun to defendant and Barrett. Barrett did most of the talking about the gun with Cyr and negotiated a ten dollar reduction in its sale price due to some scratches on the barrel. Defendant, however, filled out and executed the required Firearms Transaction Record, Bureau of Alcohol, Tobacco and Firearms ("ATF") form 4473, in her name.

3. On October 4, 1985, Barrett returned to the store alone and advised Cyr that he was interested in purchasing another shotgun. After some negotiations Cyr sold a gun to Barrett at the regular retail price. Barrett requested that Cyr fill out the Firearms Transaction Record, ATF form 4473, in defendant's name by copying the information from the ATF form 4473 which defendant had filled out and executed in connection with the October 2 transaction. Cyr agreed to do this and Barrett advised that defendant would come to the store the following morning to sign the form.

4. Barrett paid for the shotgun but Cyr did not have a "paid" sticker to affix to the box. Woolworth's requires such stickers to enable the store's "Tower Supervisor", to more easily determine that an item has been paid for. Among other assigned duties, the Tower Supervisor must verify that all items leaving the store have been paid for. To prevent Barrett from being stopped as he left the store for lack of a "paid" sticker on the gun, Cyr called Shirley Ovitt, the Tower Supervisor on duty at the time. Cyr advised her that the customer had paid for the gun, but he had run out of "paid" stickers to affix to the box. Under the circumstances, he advised Ovitt that Barrett was authorized to take the gun from the store even though the box lacked a "paid" sticker.

5. Ovitt had been acquainted with Barrett for a substantial period of time and was aware of his past criminal record. When she saw Barrett take the gun from the store she called Cyr and advised him of Barrett's criminal record. Until that point, Cyr had been unaware of Barrett's record. He thought of the sale as being in the nature of a family purchase with the gun being sold to defendant. Because defendant had filled out the ATF form 4473 for the first sale, he saw nothing wrong in her executing the form for the second sale at a later time. He assumed that Barrett may have been illiterate and, for that reason, reluctant to fill out the form.

6. The following morning, October 5, Cyr's immediate supervisor inspected the record of gun sales for the previous day and inquired about the Barrett transaction. Cyr advised him that defendant was to come to the store that day to sign the ATF form 4473.

7. Defendant failed to show up at Woolworth's to sign the form as expected. To ensure that he received the signature, Cyr went to defendant's home. He visited her home rather than telephoning because defendant has no telephone service. Defendant acknowledged to Cyr during their conversation that she knew Barrett had pur-

---

1. Throughout this opinion and order, reference to Shirley Barrett, the defendant in this case, shall be as "defendant." Reference to Barrett, means Charles Barrett.

chased the gun and she would come to the Woolworth store shortly to sign the form.

8. Defendant went to the store later that day and signed the ATF form. Cyr dated the form October 4 because the sale had taken place on that date. At that point, Cyr began to feel he had erred in conducting the sale of the second shotgun. He remained uncertain, however, about the exact nature of his error. Despite his reservations, he said nothing about his concerns to defendant who signed the form without discussion.

9. In October, 1985, Vermont State Trooper David Harrington began investigating a possible parole violation by Charles Barrett arising out of Barrett's purchase of firearms at Woolworth's earlier that month. Because such a purchase may also have violated federal law, Trooper Harrington contacted Special Agent Richard Dotchin.

10. Agent Dotchin is a special agent with the Bureau of Alcohol, Tobacco and Firearms whose duties include investigations of possible violations of the firearms laws of the United States.

11. Agent Dotchin commenced an investigation concerning Barrett's possible purchase of firearms at Woolworth's. On October 23, 1985, he interviewed Trooper Harrington. On October 24, he interviewed Carl Johnson, Barrett's parole officer. From these sources, Dotchin learned that Barrett had a previous felony conviction. This indicated a possible federal offense by Barrett as well as a possible parole violation.

12. On October 29, 1985, Dotchin interviewed and obtained affidavits from Cyr and Ovitt at the Woolworth store. At that time, Dotchin also obtained the ATF forms 4473 pertaining to the sales.

13. Parole Officer Johnson asked Dotchin for an affidavit detailing the results of his investigation as a basis for instituting immediate arrest proceedings against Barrett as a parole violator. By telephone, Dotchin discussed with Assistant United States Attorney Donald Moroz whether giving an affidavit as requested by Johnson would have an adverse effect with respect to any federal prosecution in the case. At that time, Moroz indicated that he intended to prosecute Barrett for a violation of 18 U.S.C. § 922(h)(1) (convicted felon receiving firearm transported in interstate commerce) and defendant with aiding and abetting the same crime.[2] Moroz also advised Dotchin that he could provide Johnson with the affidavit Johnson had requested without jeopardizing the federal prosecutions.

14. On the morning of October 30, 1985, Vermont State Police officers arrested Barrett for parole violation.

15. Later that morning, Dotchin and State Police Detective Sergeant William Northrup went to defendant's home. At that time, both Dotchin and Northrup considered defendant subject to prosecution for her apparent role in the purchase of the shotgun.

16. Defendant has an eighth grade education and can read and write. She has three children, has never worked and received welfare benefits in the fall of 1985. She has no known criminal record.

17. Defendant met Dotchin and Northrup at the door of her home. Dotchin and Northrup, both wearing plain clothes, immediately identified themselves as law enforcement officers. They explained to defendant that Barrett had been arrested and that they wished to speak to her.

18. Defendant then opened the door indicating that she was inviting Dotchin and Northrup into her home. The door of the

**2.** At the trial, Dotchin testified that Moroz stated that he was going to charge Barrett with violating 18 U.S.C. § 922(h)(1) and defendant with aiding and abetting him in violation of 18 U.S.C. § 2. We assume that Moroz actually meant that he intended to seek indictment of Barrett and defendant by the grand jury on those charges.

Barrett was indicted by the grand jury on January 16, 1986 of two counts of violating 18 U.S.C. § 922(h)(1). As part of a plea agreement, he pleaded guilty to one count on March 25, 1986. On May 8, 1986, imposition of sentence was suspended and Barrett was placed on probation for a period of five years.

home was closed after the officers entered, but no one recalls who closed it. Northrup, Dotchin and defendant sat at defendant's kitchen table to conduct the interview.

19. The officers did not place defendant under arrest, nor did they give her *Miranda* warnings. The officers advised her, however, that although she need not speak to them, they would appreciate receiving a statement from her.

20. When the officers informed defendant that Barrett's parole violation consisted, in part, of his receipt and possession of the firearms from Woolworth's, she responded that the guns belonged to her and not Barrett. She explained further that she, rather than Barrett, purchased the shotguns from Woolworth's.

21. Defendant's statement to ATF Agent Dotchin was false. She was not in the store on October 4, 1985 when Barrett purchased the second shotgun and carried it from the store.

22. Next, Dotchin and Northrup informed defendant that they had obtained affidavits from Woolworth employees stating that Barrett carried the first shotgun from the store and that defendant was not present at all during the second purchase. Despite Dotchin advising her of information to the contrary, defendant continued to insist she purchased both guns.

23. Dotchin then asked defendant if she kept the guns in the house. After responding in the affirmative, defendant led the officers into the living room where the guns were in a gun rack. Because the gun rack was mounted high on the wall, Dotchin assisted defendant in retrieving the guns from the rack.

24. Defendant and the officers returned to the kitchen table where Dotchin asked defendant for a written statement. After initial hesitancy, defendant agreed to give a formal written statement. Defendant arrived at this decision despite Dotchin's assurance that defendant was not required to make a statement.

25. Dotchin recorded defendant's statement exactly as she stated it. After he finished writing it, he had defendant review it and make any corrections she deemed warranted. Defendant complied with his request and corrected a few minor items.

26. In her statement, defendant essentially repeated her earlier comments to the officers, i.e. that she, rather than Barrett, purchased both shotguns and carried them from the store. Included therein was the false statement that the defendant went to the store alone and purchased the second shotgun.

27. After defendant reviewed the statement, Dotchin administered the following oath:

> I have read the foregoing statement consisting of 2 pages, each of which I have signed. I fully understand this statement and I declare, certify, verify and/or state under penalty of perjury that the foregoing is true and correct. I made the corrections shown and placed my initials opposite each. I made this statement freely and voluntarily without any threats or rewards, or promises of reward having been made to me in return for it. Executed on Oct. 30, 1985.

Dotchin recited the oath to defendant and she executed the affidavit swearing to the truth of its contents.

28. Prior to leaving defendant's home, Dotchin informed defendant that he must confiscate the firearms. Defendant objected and became upset over this information, but did not attempt to prevent the officers from taking the weapons.

## CONCLUSIONS OF LAW AND DISCUSSION

■ The United States has charged defendant, Shirley Barrett, with knowingly making a false statement to an agent of the United States Bureau of Alcohol, Tobacco and Firearms ("ATF") concerning a matter within the jurisdiction of that agen-

cy.[3] More specifically, the indictment charges defendant as follows:

On or about October 30, 1985, in the District of Vermont, Shirley Barrett, the defendant, knowingly and willfully did make a false, fictitious or fraudulent statement in a matter within the jurisdiction of the Bureau of Alcohol, Tobacco and Firearms of the Department of Treasury of the United States of America, to wit, that Shirley Barrett was the purchaser of a firearm, to wit, an F.I.E., model SB–42, .410 gauge, single-shot shotgun, serial number C1246070, from the Woolworth's Department Store, Highgate Road, St. Albans, Vermont, and that she carried said firearm out of Woolworth's on October 4, 1985, whereas in truth and fact, as Shirley Barrett then well knew, she was not the purchaser of the firearm and did not carry the firearm out of Woolworth's.[4]

As the Findings of Fact demonstrate, we find beyond a reasonable doubt that defendant's statement to ATF Agent Dotchin was false. Therefore, the only issue before the court is whether making the false statement described in the indictment constitutes a violation of 18 U.S.C. § 1001 (1982).[5]

---

**3.** Section 1001 states in pertinent part:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001 (1982).

**4.** The grand jury originally indicted defendant for three separate violations. Count 1 charged defendant with aiding and abetting Charles Barrett, a convicted felon, with receiving a firearm on October 2, 1985 which had been shipped in interstate commerce in violation of 18 U.S.C. §§ 2, 922(h)(1), 924(a). Count 3 charged defendant with knowingly making a false written statement on October 5, 1985 that she was the purchaser of the firearm in violation of 18 U.S.C. §§ 924(a), 922(a)(6). Lastly, count 4 charged defendant with knowingly and willfully making a false statement within the jurisdiction of the ATF on October 30, 1985 in violation of

To prove a violation of section 1001, the government must prove each of the following elements beyond a reasonable doubt:

1) that the defendant made a statement,

2) that the statement was made with knowledge that it was false or fictitious and fraudulent,

3) that the statement was made knowingly and wilfully, and

4) that the statement was made in relation to a matter within the jurisdiction of a department or agency of the United States.

*United States v. Silva*, 715 F.2d 43, 49 (2d Cir.1983) (citing *United States v. Adler*, 380 F.2d 917, 920 (2d Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967); *United States v. McCue*, 301 F.2d 452, 454 (2d Cir.), *cert. denied*, 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962)).

It is uncontroverted that defendant spoke to Dotchin and Northrup at her home on October 30, 1985. The court has found beyond a reasonable doubt that defendant stated that she purchased the .410 gauge shotgun and carried it from the Woolworth's store on October 4, 1985. Defendant volunteered this statement after Dotchin informed defendant that Barrett had been arrested for a parole violation. Defendant reiterated this statement in writing

---

18 U.S.C. § 1001. According to the indictment, defendant stated that on October 5, 1985 she purchased a firearm and carried the firearm from a store when actually neither fact was true. Counts 1 and 3 were dismissed without prejudice by agreement of counsel at a motion hearing on March 25, 1986.

**5.** On March 10, 1986, defendant filed a motion to suppress statements made by defendant to Dotchin and Northrup. She based this motion on the officers' failure to warn her of her *Miranda* rights prior to their interview with her on October 30, 1985.

On March 25, 1986, pursuant to an agreement, defendant withdrew her motion to suppress statements made on October 30, 1985 and the United States agreed to move to dismiss two of the three counts with which defendant had been charged by the grand jury. This agreement provided that defendant would waive a jury trial and consent to be tried by the court on the remaining count charging violation of 18 U.S.C. § 1001.

later during the same interview with Dotchin and Northrup.

 The question remains, however, whether this statement constitutes a "statement" as Congress used the word in section 1001. Defendant contends that because a true statement regarding her role in the purchase of the shotgun would have been incriminatory, her false statement falls within the exception to section 1001 known as the "exculpatory no" doctrine. The "exculpatory no" doctrine holds that section 1001 does not apply to negative responses to an investigator's questions which are false, and which serve to exculpate the individual making the statement.[6] Therefore, defendant argues that because her statement to Dotchin was exculpatory in nature, even if it was false, it did not constitute a "statement" for purposes of section 1001.

 In *Paternostro v. United States*, 311 F.2d 298 (5th Cir.1962), the United States Court of Appeals for the Fifth Circuit considered the "exculpatory no" doctrine as it relates to the meaning of "statement." In that case, defendant Paternostro appealed from a conviction under sec-

tion 1001 for statements made during the course of a criminal investigation. Paternostro made the statements for which he was indicted in response to questions posed to him by a special agent of the Intelligence Division of the Internal Revenue Service who was investigating bribery charges. The defendant responded to the agent's questions, which broached potentially incriminatory topics, with "no" or other essentially negative answers. The trial court determined that the defendant answered falsely in stating these exculpatory "no's." The Fifth Circuit determined, however, that these "no's" did not constitute "statements" within the meaning intended by Congress in section 1001. Using this reasoning, the Fifth Circuit determined that false "exculpatory no's" are not punishable under section 1001.[7]

██ In the case at bar, defendant volunteered false information that she, rather than Barrett, purchased the shotgun and carried it from the store. This statement was not a mere false denial of involvement. Instead, defendant fabricated an alternative set of facts specifically designed to

---

**6.** The United States Court of Appeals for the Fifth Circuit describes the "exculpatory no" doctrine as follows:

> section 1001 may not be used to punish people who make negative false statements to government investigators in an effort to exculpate themselves from an act they believed to be illegal.

*United States v. Anderez,* 661 F.2d 404, 409 (5th Cir.1981). *See also United States v. Johnson,* 530 F.2d 52, 55 (5th Cir.) ("section 1001 does not apply to mere answers, including untruthful ones, to investigators' questions ..."), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976). The rationale for the doctrine is that Congress intended section 1001 to punish only positive false statements that would pervert governmental functions. *Paternostro v. United States,* 311 F.2d 298, 301–05 (5th Cir.1962). Moreover, the court maintains a " 'latent distaste for an application of the statute that is uncomfortably close to the Fifth Amendment.' " *Anderez,* 661 F.2d at 409 (citing *United States v. Lambert,* 501 F.2d 943, 946 n. 4 (5th Cir.1974)). The Eleventh Circuit has a somewhat different definition of the doctrine.

> Under ..., the 'exculpatory no' doctrine, the government may not punish an individual for

giving a false negative answer in response to a governmental inquiry if (1) a truthful affirmative answer would have incriminated the individual, or (3) [sic] the individual reasonably believed that a truthful affirmative answer would have been incriminating.

*United States v. Eighteen Thousand Three Hundred Fifty Dollars ($18,350.00) in U.S. Currency,* 758 F.2d 553, 555 (11th Cir.1985).

**7.** This reasoning is buttressed by the notion that the government should not punish an individual for failing to incriminate himself to a law enforcement official. *See United States v. Stark,* 131 F.Supp. 190, 207 (D.Md.1955) ("The 5th Amendment provides that no person shall be compelled to be a witness against himself in criminal cases. While not strictly applicable here the construction of section 1001 here sought by the government seems inconsistent with this great bulwark of individual liberty.") This court notes, however, that in *Bryson v. United States,* 396 U.S. 64, 72, 90 S.Ct. 355, 360, 24 L.Ed.2d 264 (1969), the Supreme Court stated that when a government official asks a question of a citizen, that citizen may answer the question honestly, or may decline to answer the question, but he cannot with impunity knowingly and willfully answer with a falsehood.

mislead the ATF investigation.[8] In addition, the court has found that defendant did not make the false statement in response to questions asked by Dotchin. Instead, she volunteered the information after hearing the circumstances of Charles Barrett's arrest. Therefore, defendant's statement fails to fall within the "exculpatory no" exception for two reasons. First, defendant's statement does not constitute the simple "no" or essentially negative response to which the "exculpatory no" exception to section 1001 is limited. Second, defendant volunteered the false statement, rather than making it in response to questions from Agent Dotchin. Therefore, even if the court were to adopt the "exculpatory no" doctrine to limit the scope of the word "statement," the doctrine would not apply in this case.

At present, the United States Court of Appeals for the Second Circuit has not addressed the validity of the "exculpatory no" doctrine. *See United States v. Grotke*, 702 F.2d 49 (2d Cir.1983); *United States v. Adler*, 380 F.2d 917 (2d Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967); *United States v. McCue*, 301 F.2d 452 (2d Cir.), *cert denied*, 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808 (1962). Because the case at bar fails to raise a situation to which the doctrine might apply, there is no necessity for this court to rule on its validity.

■ Returning to the remaining elements of a section 1001 violation, the court also finds beyond a reasonable doubt that defendant made the false statement with knowledge that it was false. She knew when she made the statement that she had not been at Woolworth's store on October 4, 1985 when Barrett paid for the firearm and carried it from the store. She only became connected to the purchase of that shotgun on October 5, 1985 when she signed the form 4473 after the salesperson asked her to come to the store to do so. For the same reasons, the court finds that defendant made the statement knowingly and willfully.[9] Not only did defendant volunteer the statement, but, after initial hesitancy, she reaffirmed the statement in writing.

■ Lastly, the court turns to the requirement that the false statement be "in relation to any matter within the jurisdiction of any department or agency of the United States." For some time, courts struggled with the question of whether statements made to federal law enforcement officials constituted "any matter within the jurisdiction of a department or agency of the United States." *United States v. Lambert*, 501 F.2d 943 (5th Cir. 1974) (en banc) (within the scope of the statute); *United States v. Adler*, 380 F.2d 917 (2d Cir.), *cert. denied*, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967) (within the scope of the statute); *Friedman v. United States*, 374 F.2d 363 (8th Cir.1967) (not within the scope of the statute). The Supreme Court accepted certiorari in *United States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984), to address this issue. The Court concluded that a "criminal investigation surely falls within the meaning of 'any matter,' and the FBI and

---

**8.** Although defendant's false statement could have operated to exculpate herself, the court finds that defendant fabricated the facts surrounding the purchase of the firearm in an effort to exculpate Charles Barrett rather than herself. This finding, however, has no bearing on our conclusion that the case does not fall within the exception to section 1001 provided by the "exculpatory no" doctrine.

**9.** The Second Circuit suggested in *United States v. Grotke*, 702 F.2d 49 (2d Cir.1983), that the "exculpatory no" doctrine serves to limit the scope of section 1001 by narrowing the definition of "knowledge and willfulness" rather than "statement." *Cf. supra* note 6 and accompany-

ing text. In *Grotke*, the court stated "'[t]he predicate of the 'exculpatory no' defense is simply that a negative response cannot serve as proof of the requisite *knowledge and willfulness* required to convict under 18 U.S.C. § 1001, absent affirmative steps taken by the government to make the reporting requirements of the law known.'" *Id.* at 52 (quoting *United States v. Fitzgibbon*, 619 F.2d 874 (10th Cir.1980) (emphasis added)). Whether the "exculpatory no" doctrine pertains to the definition of "statement" or to "knowledge and willfulness," the court finds that the facts presented in this case fail to trigger the exception.

Secret Service equally surely qualify as 'department[s] or agenc[ies] of the United States.'" *Id.* at 479, 104 S.Ct. at 1943.

In light of this conclusion, the Court posited that "[t]he only possible verbal vehicle for narrowing the sweeping language Congress enacted is the word 'jurisdiction.'" *Id.* The Court, however, cautioned that "[i]n all [its] prior cases interpreting this statutory language [it] stressed that the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001.'" *Id.* at 480, 104 S.Ct. at 1946 (quoting *Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969) (citing *United States v. Adler,* 380 F.2d at 922)). Consistent with this reasoning, the Court interpreted jurisdiction to mean "the power to exercise authority in a particular situation." *Id.* at 479, 104 S.Ct. at 1946 (citing *Adler,* 380 F.2d at 922). Stated another way "the phrase 'within the jurisdiction' merely differentiates the official, authorized functions of an agency or department from matters peripheral to the business of that body." *Id.* The Court held that the statute shall be read literally, and therefore, shall embrace "false statements made 'in *any* matter within the jurisdiction of *any* department or agency of the United States.'" *Id.* (emphasis in original).

ATF, a bureau of the United States Department of Treasury, is charged, *inter alia,* with the enforcement and administration of the Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1214 (1968) (current version at 18 U.S.C. §§ 921–28 (1976 & West Supp.1986)). Section 7608 of Title 26 of the United States Code authorizes ATF agents to carry firearms, execute and serve search and arrest warrants, and make warrantless arrests for offenses committed in their presence or when reasonable grounds exist to believe an individual has committed or is committing a felony. In the context of this case, ATF Agent Dotchin performed an investigatory function closely analogous to that of the F.B.I. and Secret Service in *Rodgers.* Guided by *Rodgers,* this court finds that defendant's false statement to ATF Agent Dotchin constitutes a matter within the jurisdiction of an United States agency, and therefore, falls within the purview of section 1001.[10]

## CONCLUSION

The court finds beyond a reasonable doubt that defendant's statement was false, it was made knowingly and willfully with respect to a material fact[11] and con-

---

**10.** The court relies, in part, on *United States v. Rodgers,* 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984), and *United States v. Adler,* 380 F.2d 917 (2d Cir.1967) to determine that statements made to an ATF agent during the course of an investigatory interview are within the scope of proscriptions of section 1001. Defendant seeks to distinguish these cases from the case at bar based on factual differences. *Rodgers* concerned a case in which the defendant contacted the F.B.I. and falsely informed agents that his wife had been kidnapped. Two weeks later, defendant reported to the Secret Service that his wife was involved in plans to assassinate the President. Defendant fabricated both stories to trick the government officials into assisting him in locating his estranged wife who had voluntarily left him. The falsifications resulted in many government agent and administrative hours being wasted.

Defendant points out that in *Rodgers* the defendant initiated the contact with the officials. Agents acted with a belief in the truth of Rodgers' statements and in doing so wasted valuable government resources. In addition, at the time of the statements, Rodgers was not a potential

defendant in the eyes of law enforcement personnel. Clearly, the case at bar differs from the *Rodgers* case in each respect described. Similar differences exist between the circumstances of defendant's case and those found in *Adler.* The court, however, finds these differences are unrelated to the "exculpatory no" doctrine. Both *Rodgers* and *Adler* focused on whether statements made to a law enforcement officer constitute a matter within the jurisdiction of an agency of the United States. They both concluded statements that made to federal law enforcement personnel are within such jurisdiction, as the word "jurisdiction" is used in section 1001. Therefore, although the court agrees that there are marked factual distinctions between the cases cited above and the one at bar, the differences in no way compel a ruling that the "exculpatory no" doctrine should apply in the case at bar.

**11.** The United States Court of Appeals for the Second Circuit holds that materiality is not an element of the offense making a violation of section 1001. *See United States v. Elkin,* 731 F.2d 1005, 1009 (2d Cir.) (and cases cited there-

cerned a matter within the jurisdiction of the ATF. Section 1001 requires nothing more to convict the defendant of the offense charged in Count 4 of the indictment. Therefore, the court finds defendant guilty of making a false statement in violation of section 1001 of Title 18 of the United States Code.

The court will set a sentencing date as soon as the presentence investigation and report being requested this date have been completed by the probation office.

The court finds pursuant to 18 U.S.C. § 1343(a) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community and orders that she may remain at liberty in accordance with the order setting conditions of her release filed in this matter on January 27, 1986.

in), *cert. denied*, 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984). Those jurisdictions which do consider materiality an element of an offense charged under section 1001 have ruled that the question is one of law to be decided by the court, not one of fact for the jury. *E.g.*, *United States v. Beer*, 518 F.2d 168, 170–71 (5th Cir.1975); *Elkin*, 731 F.2d at 1009.