**UNITED STATES of America**

v.

**Frank RUSSO, Defendant.**

**No. 87 CR 895–1.**

United States District Court,
N.D. Illinois, E.D.

Nov. 21, 1988.

Zaldwaynaka L. Scott, Stephen P. Sinnott, Asst. U.S. Attys., Chicago, Ill., for U.S.

Raymond J. Smith, Vincent D. Pinelli, Burke & Smith Chartered, Chicago, Ill., for Russo.

### MEMORANDUM AND ORDER

MORAN, District Judge.

Defendant was convicted at a bench trial in this court on charges of mail fraud and conspiring to defraud an automobile insurance company, in violation of 18 U.S.C. §§ 371, 1341. He has now moved to arrest judgment on count VI of the indictment, which charges defendant with violating 18 U.S.C. § 1001 by knowingly and willfully

making false statements to an agent of the Federal Bureau of Investigation. Since we believe Congress did not intend to criminalize defendant's statements, we grant his motion.

At trial, the government alleged and proved the following facts beyond a reasonable doubt: In March 1985 defendant entered into a conspiracy to fraudulently collect automobile theft insurance proceeds from American States Insurance Company. On April 5 he falsely reported the theft of his 1981 Datsun Maxima stationwagon to the Chicago Ridge Police Department. One week prior to the filing of that report defendant's co-conspirator had delivered the automobile to an undercover FBI agent acting as a dealer in "give-up" cars.

On June 10, 1987, FBI Special Agent Kissinger and an officer from the Illinois Secretary of State police department interviewed defendant at his place of business. The interview was informal, it was not a custodial interrogation, and no *Miranda* warnings were given. Agent Kissinger informed defendant that they were investigating his 1985 theft report to the Chicago Ridge Police Department and asked him to relate the facts of the reported theft. Defendant replied that he had indeed reported the theft of his 1981 Datsun, and he recounted to Agent Kissinger that the vehicle was stolen on April 5, 1985 from the Chicago Ridge Shopping Mall parking lot, where he claimed he had last parked it. Defendant and the agent knew at that time that these statements were false.

In this court's oral ruling on September 21, 1988, we questioned whether these facts constitute a violation of § 1001 and invited defendant to address the legal issues in post-trial briefs. The question raised here is whether making the false statement described in the indictment—and proved at trial—constitutes a violation of § 1001.

Section 1001 provides that

[w]hoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statement or representations

shall be subject to fine and/or imprisonment. This section "had its origin in a statute passed almost 100 years ago, in the wake of a spate of frauds upon the government." *United States v. Bramblett*, 348 U.S. 503, 504, 75 S.Ct. 504, 505, 99 L.Ed. 594 (1955). Section 1001's initial design was to proscribe false statements if they were made with the " 'intent of cheating and swindling or defrauding the Government of the United States' as well as if made for the purposes of obtaining payment of a false claim." *Id.* at 506 n. 2, 75 S.Ct. at 506 n. 2. The statute was broadened in a 1934 amendment by eliminating the restriction of its application to cases where the government suffered pecuniary or property loss. *See United States v. Schnaiderman*, 568 F.2d 1208, 1212 n. 10 (5th Cir.1978). "The amendment indicated the congressional intent to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Gilliland*, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941).

■ Despite the broad language of the statute, courts have limited its application to situations that Congress intended to reach. First, a false statement is not a crime unless the statement is material to the authorized functions of the agency. *United States v. Kwiat*, 817 F.2d 440, 445 (7th Cir.), *cert. denied sub nom. Kehoe v, United States*, —— U.S. ——, 108 S.Ct. 284, 98 L.Ed.2d 245 (1987); *United States v. Bailey*, 734 F.2d 296, 305 (7th Cir.), *cert. denied*, 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984). False statements may be material even though they do not actually mislead federal agents, so long as they have that potential at the time the statements were made. *Kwiat, supra; United States v. Brantley*, 786 F.2d 1322, 1326 (7th Cir.), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986).

■ Second, under limited circumstances § 1001 does not reach false denials of involvement in criminal activities made in response to direct inquiry by a federal investigatory agent with the intention of ex-

culpating the individual making the statements. *See, e.g., United States v. Tabor,* 788 F.2d 714 (11th Cir.1986); *Paternostro v. United States,* 311 F.2d 298 (5th Cir. 1962); *United States v. Barrett,* 639 F.Supp. 1342 (D.Vt.1986). This limitation on § 1001 is often referred to as the "exculpatory denial" or "exculpatory no" doctrine.

*Paternostro* was the first case to crystallize the "exculpatory denial" doctrine. There the defendant had falsely responded "no" to questions by a special agent of the Internal Revenue Service concerning an alleged failure to report illicit income. Although the agent administered an oath, the defendant made no statement relating to a claim against the United States government, was not seeking employment, and "did not aggressively and deliberately initiate any positive or affirmative statement calculated to pervert the legitimate functions of government." *Id.* 311 F.2d at 305. The court noted that

> [a]t most ... the answers were mere negative responses to questions propounded to him by an investigating agent during a question and answer conference, not initiated by the [defendant].

*Id.* In a thorough opinion that reviews legislative history and pertinent case law, the court held that the defendant's statements did not fall within the purview of the statute.[1]

Underlying the exculpatory denial exception are various judicial concerns. First, keeping an eye to the statute's main purpose of deterring persons from making fraudulent claims against the government, courts have limited the reach of the broadly worded statute to those situations which Congress intended to criminalize. *See Friedman v. United States,* 374 F.2d 363, 366 (8th Cir.1967) (stating "there is nothing to indicate that Congress intended this statute to have application substantially beyond the purposes for which it was created," and holding that a literal application would produce "patently absurd results").[2] Another concern underlying the doctrine is the encroachment of § 1001 on a defendant's rights against self-incrimination. *See United States v. Lambert,* 501 F.2d 943, 946 n. 4 (5th Cir.1974) (*en banc*) ("Undoubtedly the judicial gloss put on § 1001 by the 'exculpatory no' decisions originates at least in part from latent distaste for an application of the statute that is uncomfortably close to the Fifth Amendment"). An individual confronted with a federal inquiry, prior to notice that he is the subject of a criminal investigation, may well neither confess nor remain silent. It is true that the individual's constitutional right is not actually violated because he "may de-

---

1. Courts that have examined the exculpatory-denial doctrine emphasize certain limitations. For example, courts are more willing to invoke the doctrine when the defendant is unaware that he is the target of a criminal investigation, *see Tabor,* 788 F.2d at 718. Further, the doctrine may be inapplicable where the defendant's initial contact with the federal agency is voluntary, or where the defendant "fabricated an alternative set of facts specifically designed to mislead the" federal investigation. *Barrett,* 639 F.Supp. at 1348–49 (D.Vt.1986). Finally, the doctrine does not apply to one seeking entry to the United States who falsely reports currency in his possession to a federal customs agent. *See United States v. Grotke,* 702 F.2d 49 (2d Cir.1983); *United States v. Fitzgibbon,* 619 F.2d 874 (10th Cir.1980).

2. In *Friedman,* the defendant had affirmatively filed a false statement to the FBI to initiate a criminal investigation. The Eighth Circuit ruled that § 1001 did not apply in that case, noting that a violation of § 1001 would carry heavier penalties than committing perjury in court. The Supreme Court, in *United States v. Rodgers,* 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984), expressly disagreed with that holding. In *Rodgers,* the defendant had lied in telling the FBI that his wife had been kidnapped, and in telling the Secret Service that his wife was involved in a plot to kill the President—causing the two agencies to expend over 250 investigatory hours in search of her. After locating his wife in Arizona, the defendant admitted that he made the false reports to induce the federal agencies to find her. The Court, reversing the Eighth Circuit, held that § 1001 applied. Recognizing that the holding in *Friedman* is no longer valid law, we note that our citation to that case is only for the proposition that the statute cannot be applied to produce absurd and unintended results. Factual distinctions in *Friedman* and *Rodgers*—an affirmative filing by the defendant of a false statement in an effort to instigate an investigation, rather than a false denial of involvement in criminal activity—renders these decisions inapposite here.

cline to answer the question, or answer it honestly ...". *Bryson v. United States*, 396 U.S. 64, 72, 90 S.Ct. 355, 360, 24 L.Ed.2d 264 (1969). However, given the statute's tension with this constitutional right, courts are reluctant to employ § 1001 in the context of criminal investigations where the individual has not affirmatively sought to provide the government with misinformation.

Finally, it is common experience that at least the initial responses by persons who are under investigation and are informally interviewed are less than candid. The truth emerges, if at all, only after the person understands that he is a target and that the government has substantial other evidence which indicates that the person has committed a criminal offense. In multiple defendant cases it is not uncommon for all or many primary government witnesses to be codefendants who told an exculpatory story when initially approached by the government, and who thereafter confessed, pled guilty to the underlying offense and agreed to testify. In some cases there is a well-founded basis for scores of § 1001 charges if the offense is as broadly defined as the government insists. But that initial misinformation is generally the stuff of cross-examination by defendants' counsel, not separate charges by the government. We doubt that Congress intended such an immense increase in prosecutorial discretion.

That prospect is enhanced when, as here, the government already knows the true answer. Since statements are material so long as they have the potential to mislead, the government can multiply the counts by inviting repetition of what it then knows to be false. Presumably, if Russo had thrice told the same story to a federal agent, we would have three § 1001 charges, although the criminal conduct for which he has been prosecuted—participating in an insurance fraud respecting his automoble—would remain the same.

In sum, Congress had a specific goal in mind when it enacted and amended § 1001. Despite the broad terms of the statute, it is the responsibility of the courts to ensure an application of its reach consistent with congressional intention. We believe the "exculpatory denial" doctrine draws from proper limitations on the law's underlying rationale. We doubt whether Congress intended § 1001 to reach individuals who fail to render complete confessions upon initial contact by a federal agent, especially where the individual has not been administered a solemn oath nor even informed of a pending investigation into possible criminal misconduct.

The Seventh Circuit recently referred to this doctrine "as a very limited exception to section 1001." *United States v. King*, 613 F.2d 670, 674 (7th Cir.1980). Reviewing the case law, *King* held that the doctrine

> is limited to simple negative answers, without affirmative discursive falsehood, under circumstances indicating that the defendant is unaware that he is under investigation, and is not making a claim against, or seeking employment with the government.

*Id.* (citations omitted).

■ We believe that the "exculpatory denial" doctrine is applicable here. Defendant did not initiate the interview with Special Agent Kissinger, he sought no benefit from the government and was not informed that he was under investigation for insurance fraud. His response to Agent Kissinger's questions were essentially a reiteration of his earlier police report, and while his statements admittedly amounted to more than a mere "no," his response was not an attempt to fabricate an alternative set of facts intended to pervert the functioning of the FBI. Instead, his false statements were solely and directly an effort to exculpate himself from criminal activity.

We do not think a different result in this case is warranted by the Seventh Circuit holding in *King*. The defendant there was convicted for making false statements in furtherance of his application for supplemental security income benefits. The court held the exculpatory denial doctrine inapplicable because, in one instance, the false statements were made for the purposes of receiving federal benefits and because, in

another instance, the defendant was read his *Miranda* warnings and knew that he was under investigation. *Id.* 613 F.2d at 674–75. Defendant's response here was more than "simple negative answers" but not much more, and we believe the "exculpatory no" doctrine applies.

## CONCLUSION

Defendant's false statements to FBI Agent Kissinger on June 10, 1987 do not constitute a violation of § 1001. This court therefore grants defendant's motion to arrest judgment.