UNITED STATES of America, Plaintiff,

v.

Leonard KELLER, et al., Defendants.

No. 89 CR 793.

United States District Court,
N.D. Illinois, E.D.

Jan. 25, 1990.

Harvey Silets, William G. Sullivan, Chicago, Ill., for Leonard Keller.

George Murtaugh, Chicago, Ill., for David Weisbaum.

Howard Weintraub, Atlanta, Ga., Louis B. Garippo, Louis B. Garippo, Ltd., Chicago, Ill., for Carl Franco.

Steven Ludwick, Atlanta, Ga., Terence P. Gillespie, Genson, Steinback & Gillespie, Chicago, Ill., for Mark Brotman.

Nan Nolan, Chicago, Ill., for Philip Singer.

Bernard Panetta, Caballero, Panetta & Ortega, El Paso, Tex., Nan Nolan, Kahn, Robinson, Curley & Clayton, Chicago, Ill., for Minerva Franco and Edward Franco.

Michael Monico, Monico, Pavich & Spevack, Chicago, Ill., for Steven Waitzman.

Joseph V. Roddy, Chicago, Ill., for Timothy Urwin.

Patrick A. Tuite, Cynthia Giacchetti, Tuite, Mejia & Giachetti, Chicago, Ill., for Mark Sonshine.

Thomas D. Decker, Thomas D. Decker & Assoc., Chicago, Ill., for Robert Peterson and Herman Diehl.

John Newman, Caryn Jacobs, Joan Safford, Asst. U.S. Attys., for U.S.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

Before the court are a number of pretrial motions of the defendants.[1] They are discussed below.

### Motions to Dismiss or Strike The Indictment

■ Defendants have moved to dismiss or strike various portions of the indictment. A sufficient indictment should state all the elements of the offense, inform the defendant of the charges so he or she may prepare a defense, and enable the defendant to plead the judgment as a bar to a later prosecution. *United States v. Gironda*, 758 F.2d 1201, 1209 (7th Cir.), *cert. denied*, 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985).

Defendants argue Count One, which claims a RICO conspiracy in violation of 18 U.S.C. § 1962(d), "is impermissibly vague and duplicitous in that it fails to allege how the defendants were engaged in a single conspiracy." It is alleged that an enterprise (referred to as the "Keller Currency Exchanges") existed and that it consisted of 67 currency exchanges located in 13 states. Each exchange is owned in part by defendant Keller and three other defendants have partial interests in some of the exchanges. The defendants are owners, managers, and/or employees of various Keller Currency Exchanges. The alleged predicate acts are violations of certain laws governing currency transactions, *see* 31 U.S.C. §§ 5322(a), 5322(b), 5324, and violations of the Travel Act, 18 U.S.C. § 1952, which defines the currency violations as

unlawful activity under the Travel Act. *See also* 18 U.S.C. §§ 1961(1)(B) & (E). The alleged currency law violations consisted of failing to file required currency transaction reports ("CTR") for cash transactions with an individual exceeding $10,000 in a single day. *See* 31 U.S.C. § 5313; 31 C.F.R. §§ 103.22(a)(1), 103.26(a)(1). These transactions were with two undercover agents using the aliases Dick Jones and Terrance Jordan.[2] Cash transactions exceeding $10,000 were allegedly divided into several smaller transactions and money orders were sold that were not consecutive in number and with different dates. Thirty currency transactions of over $10,000 each resulted in the issuance of 1214 money orders, each under $10,000 and totalling about two million dollars. The money orders were issued from 40 of the Keller Currency Exchanges. Cash taken to one currency exchange sometimes resulted in the issuance of money orders from one or more other exchanges. No defendant is alleged to be directly involved in more than one transaction except Weisbaum who is alleged to be involved in two and Keller who is alleged to be involved in most of the 30. It is further alleged that Keller agreed to make all the exchanges available to the agents and that he charged fees in excess of the normal charge in exchange for not filing CTR's. It is also alleged that defendants "agreed to conduct the enterprise through a pattern of racketeering" which consisted of the above described structuring of transactions and failure to file the CTR's. Furthermore, it is alleged that defendants Keller, Carl Franco, Brotman, Singer, Urwin, and Sonshine provided false and misleading information to government agents regarding the currency transactions with Jones and Jordan in order to cover up acts committed pursuant to the conspiracy.

■ Defendants contend this is a classic example of trying to tie together into a

---

1. On January 5, 1990, this court ruled on defendants' pretrial discovery motions including defendants' motion for bill of particulars. The *motion for bill of particulars was denied.* Later that day, defendants filed a reply in support of that motion. The reply has been considered

and no reason has been found to change the previous ruling on that motion.

2. The various filings in this case refer to this undercover agent as both "Jordan" and "Jordon." "Jordan" is used throughout this opinion.

single conspiracy the various "spokes" that surround a single "hub" (Keller) even though there is no "rim" forming the "spokes" into a "wheel." *See Kotteakos v. United States*, 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946). As with most of the cases cited by the parties, *Kotteakos* involved the question of whether convictions were improper because, although a single conspiracy was alleged in the indictment, the proof at trial was of multiple and separate conspiracies. As regards the issue now before this court, the question is whether a single conspiracy is alleged in Count One, not whether the government's proof at trial will only show multiple conspiracies. *See United States v. Antonucci*, 663 F.Supp. 245, 246 (N.D. Ill.1987). The indictment in this case alleges all defendants agreed to work together, not simply that each of the other defendants agreed to perform certain activity with Keller. This allegation is further supported by allegations that most of the alleged transactions involved issuing money orders from more than one currency exchange, not just the one a particular defendant worked at. A single conspiracy is alleged in Count One. Whether the evidence at trial will prove a single conspiracy is a separate question that is not addressed.

■ Defendants seek to strike the allegations in paragraphs 13(A) through 13(E) of Count One regarding alleged false and misleading statements on the ground that they refer to "overt acts and statements outside the scope of and not 'in furtherance' of the conspiracy." It is alleged in ¶ 5 of the indictment that defendants conspired to "disguise and conceal large currency transactions over $10,000." Denying that they engaged in transactions exceeding $10,000, denying that they knew the undercover agents, and claiming that necessary reports were filed could contribute to disguising and concealing the large currency transactions. For example, telling

investigators that Jones had only made six or seven transactions and that Jones had not made any transactions in the past six months could mislead investigators into limiting their search of exchange records and thereby help to conceal the large currency transactions. Claiming that necessary CTR's had been filed could lead investigators to discontinue the investigation at that exchange. Most of ¶ 13 will not be stricken. Certain allegations, however, whether or not admissible as evidence, are not acts that could have furthered the alleged conspiratorial purpose of concealment by providing false information. Paragraphs 13(A)(vii),[3] 13(A)(viii), and 13(B)[4] of Count One shall be stricken from the indictment.

■ Defendants also argue the paragraphs should be stricken because of the manner in which the statements were obtained, *i.e.*, without informing defendants Jones and Jordan were undercover agents. Defendants cite no authority in support of this proposition. Absent a showing that the statements should be suppressed because involuntary or otherwise improperly obtained, the paragraphs will not be stricken based upon how the information was obtained.

■ Defendants also argue the paragraphs should be stricken because the statements obtained violate the "exculpatory no" doctrine. The government argues the exculpatory no doctrine no longer has any validity. As discussed below, this court holds otherwise. However, whether the statements should be excluded under that doctrine would require consideration of details and facts not contained in the indictment. *United States v. Gilpin*, 678 F.Supp. 1361, 1363 (N.D.Ill.1988). The allegations of the indictment are generally insufficient to determine if defendants gave simple negative answers among other things. In any event, defendants cite no authority to support their proposition that

---

3. Defendants also moved to strike ¶ 13(A)(vii) on the ground it contains unduly prejudicial surplusage regarding illicit drugs. Since this paragraph is otherwise being stricken, that "motion to strike" need not be decided.

4. Carl Franco's name should also be stricken from the introductory section of ¶ 13.

the exculpatory no doctrine is a generally applicable evidentiary rule, not just a defense to a charge under 18 U.S.C. § 1001. Paragraph 13 does not charge a violation of § 1001 and the exculpatory no doctrine will not be extended beyond that statute. The remaining allegations of ¶ 13 will only be stricken to the extent the statements are found inadmissible at trial.

The indictment sufficiently alleges the elements of a RICO claim and defendants have sufficient information in order to prepare a defense. There is no basis for dismissing Counts One and Two on the ground the RICO enterprise and its relationship to the predicate acts are not adequately alleged. There are also adequate allegations of a pattern of racketeering activity. Furthermore, the RICO counts will not be dismissed on the ground that any portion of the RICO statute is unconstitutionally vague.

■ Defendants argue that most of the currency transaction counts must be dismissed because the currency transactions involved government money being used by the undercover agents. Section 5313 of Title 31 provides that the Secretary of the Treasury shall prescribe regulations as to what currency transactions must be reported. Those regulations exempt "deposits, or withdrawals, exchanges of currency or other payments and transfers by local or state governments, or the United States or any of its agencies or instrumentalities." 31 C.F.R. § 103.22(b)(2)(iii). A number of courts have held that exemption applies only to transactions by government agencies in their normal course of government business, not transactions by undercover government agents. *United States v. Hernando Ospina*, 798 F.2d 1570, 1579–80 (11th Cir.1986); *United States v. Richter*, 610 F.Supp. 480, 490–91 (N.D.Ill.1985), *affirmed sub nom. by unpublished orders*, *United States v. Mangovski*, 785 F.2d 312 (7th Cir.), & *United States v. Konstantinov*, 793 F.2d 1296 (7th Cir.), *cert. denied*, 479 U.S. 855, 107 S.Ct. 191, 93 L.Ed.2d 124 (1986); *United States v. Bucey*, 691

F.Supp. 1077, 1086–87 (N.D.Ill.1988), *aff'd in part, rev'd in part*, 876 F.2d 1297 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989). Defendants cite no contrary cases. They argue, however, that, in order for there to be a violation, Congress must expressly state that transactions by undercover agents can violate the statute. They cite as an example 18 U.S.C. § 1956(a)(3). But an element of the offense under that statute is that the money involved in the transaction represent the proceeds of unlawful activity. Money of undercover agents would not satisfy that requirement absent an exception. As regards the statute defendants are charged under, however, the question is whether the Secretary has defined the transactions involved in this case as ones for which CTR's must be filed, not whether Congress has stated transactions of undercover agents are covered by the statute.[5] In accord with the above-cited cases, defendants were required to file CTR's for the transactions alleged in the indictment.

■ Defendants also argue that the reporting requirements of the statute violate their Fifth Amendment protection from self-incrimination. The reporting requirements do not violate the Fifth Amendment. *Bucey*, 691 F.Supp. at 1085; *Richter*, 610 F.Supp. at 491–92.

Defendants move to strike from certain counts the allegation that the currency violations were committed while violating RICO, 18 U.S.C. § 1962(d). A willful violation of the currency reporting laws or regulations is a felony punishable by a fine of up to $250,000 and up to five years' imprisonment. *See* 31 U.S.C. § 5322(a). A willful violation of the currency reporting laws or regulations "while violating another law of the United States" is a felony punishable by a fine of up to $500,000 and up to ten years' imprisonment. *See* 31 U.S.C. § 5322(b). Defendants argue a RICO violation with currency reporting violations as the predicate acts does not constitute "violating another law" under § 5322(b).

---

**5.** Defendants do not argue that the Secretary exceeded the bounds of the statute in setting reporting requirements nor that Congress could not delegate such authority to the Secretary.

Section 5322(b) was originally enacted in 1970 as § 210 of the Currency and Foreign Transactions Reporting Act and was codified as 31 U.S.C. § 1059. The statute originally referred to currency violations "committed in furtherance of the commission of any other violation of federal law." The legislative history does not clarify what is meant by "any other violation of federal law," but the purpose of the law was stated as follows: "It should be noted that serious violations under this title may involve very large sums of money, and fines of as much as $10,000 or more might be shrugged off as a mere cost of doing business. To have any real deterrent effect, the potential fine must be large enough to have some real economic impact on potential violators." H.R.Rep. No. 975, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Admin.News 4394, 4406. In 1982, the statute was recodified to its present numbering. Some language changes were made to be consistent with the new statute, but no substantive change was intended. *See* H.R.Rep. No. 651, 97th Cong., 2d Sess. 177–78, *reprinted in* 1982 U.S.Code Cong. & Admin.News 1895, 2071–72. In 1984, § 5322(a) was amended to change the maximum penalties from the former amounts of $1,000 and one year's imprisonment to the present level. The House stated: "While the full scope of these provisions is broad, it is important to recognize that they are primarily directed at persons who make a lucrative career in the illicit drug trade and organized crime. As such, the penalties are far too low to deter and punish such activity. Indeed the modest penalties now applicable may simply be written off as a basic cost of doing business." *See* Sen.Rep. No. 225, 98th Cong., 2d Sess. 302, *reprinted in* 1984 U.S. Code Cong. & Admin.News 3182, 3482. At the same time, RICO was amended to make currency reporting violations predicate RICO acts. That amendment was "made in recognition that major currency transaction violations are inherently a part of all major drug racketeering schemes and orga-

nized crime money laundering activities." *Id.* at 303, Admin.News at 3483.[6]

The reported cases as to what is meant by "another law" as used in § 5322(b) do not involve any issues similar to the question now before the court. *See United States v. Benson,* 640 F.2d 136, 140 (8th Cir.1981) (no requirement that primary purpose of currency violation be the violation of another law); *United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979) (sufficient evidence that currency violation was committed in furtherance of a drug violation); *Bucey,* 691 F.Supp. at 1082–83 (violation of 18 U.S.C. § 1001 is a violation of another law).

■ As the government argues, it is clear that a person may be convicted of, and consecutive sentences imposed for, both a RICO conspiracy and the predicate offenses. *United States v. Aleman,* 609 F.2d 298, 306–07 (7th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); *United States v. Hawkins,* 658 F.2d 279, 286–88 (5th Cir.1981); *United States v. Scotto,* 641 F.2d 47, 56 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981); *United States v. Boylan,* 620 F.2d 359, 361 (2d Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). Those decisions, however, are based on the legislative purpose of RICO. The question here is whether RICO should be considered the violation of another law as that term is used in § 5322(b). The Seventh Circuit has stated that, "The provisions of section 1962 do not create 'new crimes' but serve as the prerequisites for the invocation of increased sanctions for conduct which is proscribed elsewhere in both federal and state criminal codes." *United States v. Neapolitan,* 791 F.2d 489, 495 (7th Cir.), *cert. denied,* 479 U.S. 939, 940, 107 S.Ct. 421, 422, 93 L.Ed.2d 371 (1986).

■ Construing RICO as another law under § 5322(b) would result in a doubly enhanced penalty; proof of a RICO pattern

---

**6.** It is also noted that the maximum penalties for § 5322(b) violations were increased to their present level in 1986. The reported legislative history on that statute does not discuss the amendment to § 5322(b). *See* 1986 U.S.Code Cong. & Admin.News 5393–94.

and enterprise would turn a § 5322(a) violation into both a § 5322(b) violation and a RICO violation. Double enhancements by the same elements are not favored. *See, e.g., Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980); *Simpson v. United States,* 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978); *People v. Haron,* 85 Ill.2d 261, 52 Ill.Dec. 625, 422 N.E.2d 627 (1981). Also where the statutory language and legislative history are unclear, the rule of lenity should be applied in construing the statute. *Busic,* 446 U.S. at 406, 100 S.Ct. at 1752; *Simpson,* 435 U.S. at 14, 98 S.Ct. at 913. As recited above, the legislative history in this case is not particularly helpful. To the extent it indicates anything, it indicates that the primary purpose of the § 5322(b) enhancement was to increase the punishment in cases involving drug offenses also. The challenged counts do not allege defendants were involved in drug crimes. Another portion of the statute seems to indicate § 5322(b) enhancement is not appropriate in the present circumstances. Another means of satisfying § 5322(b) is by showing the currency violation was "part of a pattern of any illegal activity involving more than $100,000 in a 12–month period." If a RICO violation based on currency violations constitutes violation of "another law" and such offense involved amounts of less than $100,000, then a pattern of illegal activity of less than $100,000 could still enhance the statute. This would seem to be inconsistent with the intent of the statute. Still, proof of a RICO violation involves proof of elements in addition to those necessary for a § 5322(a) violation. In addition to a violation of currency reporting laws, the existence of an enterprise and a pattern of activity must be shown.[7]

 As the government argues, § 5322(b) is essentially a sentencing enhancement. Therefore it is unnecessary to decide this issue at the present time. This aspect of defendant's motion to dismiss is denied without prejudice to raising it after trial if any defendant is found guilty of a § 5322 violation.

 Defendants also argue that each defendant can only be charged with one count of violating § 5322(b) based on a pattern involving transactions in excess of $100,000. The law is to the contrary. *See Bucey,* 691 F.Supp. at 1083–84. Each transaction that is part of the pattern may be charged as a § 5322(b) offense.[8]

 Keller argues Count 61, which alleges a violation of 18 U.S.C. § 1001, should be stricken because materiality is not alleged and because of the "exculpatory no" doctrine. Defendant argues materiality cannot be satisfied because the government already knew the answer to all the questions to which Keller allegedly provided false answers and therefore he could not have misled the government agents.[9]

 Whether a statement is material is a question of law for the court, not a question for the jury. *United States v. Brantley,* 786 F.2d 1322, 1327 (7th Cir.), *cert. denied,* 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986). "The test for materiality is whether the false statement has a

---

7. The government also argues that the alleged RICO conspiracy involves predicate offenses other than currency violations because Travel Act violations are also alleged. The alleged Travel Act violations are using interstate facilities with intent to promote, facilitate, or carry on currency reporting violations. *See* 18 U.S.C. § 1952(a)(3) & (b)(3). The same analysis that applies to RICO may also apply in determining if Travel Act violations constitute the violation of "another law."

8. Since the first $100,000 of transactions is not charged as a § 5322(b) offense based on the pattern, it is unnecessary to determine if only those transactions after the first $100,000 of transactions may be charged under § 5322(b).

9. Section 1001 does not expressly state that false statements must be material in order to violate the statute. The express requirement of materiality is contained in another portion of the statute. The materiality requirement, however, has been read into all aspects of the statute. *See United States v. Bailey,* 734 F.2d 296, 305 (7th Cir.), *cert. denied,* 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984); *United States v. Di Fonzo,* 603 F.2d 1260, 1266 (7th Cir.1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *United States v. Beer,* 518 F.2d 168, 170–71 (5th Cir.1975). *But see United States v. Elkin,* 731 F.2d 1005, 1009 (2d Cir.), *cert. denied,* 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984).

tendency to influence or is capable of influencing a federal agency." *Brantley*, 786 F.2d at 1326 (quoting *United States v. Brack*, 747 F.2d 1142, 1147 (7th Cir.1984), *cert. denied*, 469 U.S. 1216, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985)). It is clear that the government employee does not have to be actually deceived. *See United States v. Di Fonzo*, 603 F.2d 1260, 1266 (7th Cir.1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980) (quoting *United States v. Beer*, 518 F.2d 168, 172 (11th Cir.1975)); *United States v. Chandler*, 752 F.2d 1148, 1151 (6th Cir.1985); *United States v. Fern*, 696 F.2d 1269, 1273 (11th Cir.1983) (quoting *United States v. Lichenstein*, 610 F.2d 1272, 1278 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980)).

Two circuits have held that the materiality requirement can be satisfied even when the government employee already knew the answers to the questions that produced false responses from the defendant. In *United States v. Goldfine*, 538 F.2d 815, 820–21 (9th Cir.1976), the court stated:

> [W]e believe that the conduct Congress intended to prevent by § 1001 was the willful submission to federal agencies of false statements calculated to induce agency reliance or action, irrespective of whether actual favorable agency action was, for other reasons, impossible. We think the test is the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end as measured by collateral circumstances.

*Id.* at 820–21 (quoting *United States v. Quirk*, 167 F.Supp. 462, 464 (E.D.Pa.1958), *aff'd*, 266 F.2d 26 (3d Cir.1959)). *Accord United States v. Pereira*, 463 F.Supp. 481, 486–87 (E.D.N.Y.1978) (*dictum*). In *Goldfine*, compliance investigators of the Drug Enforcement Administration already knew the defendant, who was a pharmacist, had made out-of-state purchases. In *United States v. Whitaker*, 848 F.2d 914, 916 (8th Cir.1988), the Eighth Circuit held that the knowledge of the government employee at the time the defendant made the false statements is irrelevant to materiality. In that case, the FDIC examiner's knowledge

was from other sources. The Eighth Circuit cited *Goldfine* in support of the proposition that "a false statement can be material even if the agent to whom it is made knows that it is false." *Whitaker*, 848 F.2d at 916. *Whitaker* also states that the issue of materiality must be determined in the "particular context involved." *Id.*

Resolution of the question before the court turns on the degree to which the alleged false statements should be abstracted from their context. They cannot be totally removed from their context; for with no context whatsoever they cannot possibly be material because it would not be known what might be influenced. The government essentially argues that the proper level of abstraction in the present case is to the situation of investigating agents seeking information about an investigation into currency violations. Viewed in that context, the alleged false statements of Keller were material because the agents could have been influenced in their investigation. It is not believed that the abstraction should go so far. The alleged statements of Keller should be viewed in the "particular context" in which they were obtained. They were statements solicited from Keller regarding the activity of an undercover agent. When the statements only concern the activity of an undercover agent, they could not possibly influence or mislead the agents asking the question. Unlike *Goldfine* and *Whitaker*, this is not so simply because of what the questioning agent's knowledge may have been at the time of questioning. This is so because the government necessarily has direct access to information about its own agent's activity. There may be no circumstance (absent, perhaps, death or disability of the agent before he or she files an adequate report) where the government can be misled about statements concerning the activity of its own agents. Still, *Goldfine* states that the key is whether the false statements were "calculated to induce agency reliance or action." 538 F.2d at 820. It can be argued that the statements of Keller, who did not yet know Dick Jones's true identity, were so calculated. It is a close question wheth-

**160**

er the materiality requirement can be satisfied. Where the Seventh Circuit has not yet spoken, this court should follow the decisions of other circuit courts. *See Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir.1987); *Richards v. Local 134, International Brotherhood of Electrical Workers*, 790 F.2d 633, 636 (7th Cir.1986). *Goldfine* and *Whitaker*, therefore, will be followed. This aspect of the motion to dismiss Count 61 is denied without prejudice. The court will reconsider the issue with a full record before it if moved to do so after trial.

■ Keller also moves to strike Count 61 based on the "exculpatory no" doctrine. The Seventh Circuit last recognized that doctrine to be applicable in a § 1001 prosecution in *United States v. King*, 613 F.2d 670, 674 (7th Cir.1980). The government argues that doctrine should no longer be recognized in light of *United States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984). The government concedes, however, that that case is not on point and cannot be construed as directly overruling the exculpatory no doctrine. This court should not lightly disregard Seventh Circuit precedents. This court must follow Seventh Circuit precedents unless subsequent decisions of that court or the Supreme Court make it "almost certain" the doctrine would be repudiated if presented. *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734 (7th Cir. 1986). Also, as already mentioned, this court should generally follow the decisions of other circuits where the Seventh Circuit has not yet spoken. It is not "almost certain" that the exculpatory no doctrine would be overruled in light of *Rodgers*. Moreover, at least two circuits have continued to apply the doctrine even in light of *Rodgers. See United States v. Cogdell*, 844 F.2d 179, 183 (4th Cir.1988); *United States v. Alzate–Restreppo*, 890 F.2d 1061, 1065–67 (9th Cir.1989); *United States v. Olsowy*, 836 F.2d 439, 441 (9th Cir.), *cert. denied*, 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988); *United States v. Medina de Perez*, 799 F.2d 540, 543 (9th Cir. 1986). *See also United States v. Tabor*, 788 F.2d 714 (11th Cir.1986) (decided after

*Rodgers*, but does not expressly refer to *Rodgers* ). The government cites no contrary appellate cases and none have been found. This court will continue to follow *King*. Following *King*, the doctrine is generally "limited to simple negative answers, without affirmative falsehood, under circumstances indicating that the defendant is unaware that he is under investigation, and is not making a claim against, or seeking employment with the government." *King*, 613 F.2d at 674. *See also United States v. Russo*, 699 F.Supp. 1344, 1347–48 (N.D.Ill. 1988).

If the only motions before this court were motions to dismiss the indictment, no portion of Count 61 could be dismissed before a trial because it is not clear from the allegations of the indictment that the questioning occurred while Keller was unaware he was under investigation. Also, it is not always clear if simple negative answers are being alleged. However, Keller has also moved to suppress the statements he gave in the July 8, 1989 interviews which form the basis of Count 61. In support of that motion, the court held a hearing, Keller presented evidence, and the government produced the memorandum of interview for the July 8 interviews. That evidence shows that, until the second interview, Keller was unaware he was under investigation and the memorandum gives further detail as to allegedly false statements of Keller. Initially he was told that the investigation concerned only Jones, Jordan, and DePaulo. In light of that evidence, it can be determined that certain statements should be stricken to the extent they would be the basis for a § 1001 charge.

■ As alleged in ¶ 3(A) of Count 61 and as indicated by the memorandum of interview, Keller was shown a picture of Jones and denied knowing his name. This is a simple negative answer that cannot be used to prove the § 1001 charge. Count 61 ¶ 3(A) shall be stricken from the indictment.

■ The memorandum of interview indicates that Keller's statement that he did

not know of any out-of-state transactions of Jones other than the one in Jacksonville was in response to a question from one of the IRS agents regarding if he knew of any others. That response cannot be used to prove the § 1001 charge. Count 61 ¶ 3(E) shall be stricken from the indictment.

■ As indicated by the memorandum of interview, Keller stated he did not know the source of Jones's cash in response to a question from one of the IRS agents. That is a simple negative answer that cannot be used to prove the § 1001 charge. Count 61 ¶ 3(G) shall be stricken from the indictment.

■ Count 61 ¶ 3(H) alleges "Keller stated that he did not have to file a Cash Transaction Report, regardless of the amount of the total transaction, if each money order did not exceed $10,000." This statement is further alleged to be inconsistent with Keller's explanation of the filing requirements to Jones. The statement alleged, however, is a statement of legal requirements. Since it is a statement of law, not fact, it cannot constitute a false statement of material fact underlying a § 1001 violation. Count 61 ¶ 3(H) shall be stricken.

Paragraphs 3(B), (C), (D), and (F) of Count 61, all involve affirmative misrepresentations and will not be stricken. The statements from the memorandum of interview (Defendant's Exhibit 1) charged in paragraphs 3(A), (E), (G), and (H), are stricken only for purposes of supporting a § 1001 charge. They are not excluded from evidence to the extent that they may be admissible to support any other charge.

Certain defendants move to dismiss the Travel Act counts on the ground that the interstate travel or interstate facility element cannot be satisfied. Defendants argue the interstate activity was either manufactured by the government or is not sufficiently related to the alleged crimes. The arguments of defendants have been fully considered and no basis has been found for dismissing any count of the indictment. *See generally United States v. Podolsky,* 798 F.2d 177, 180–81 (7th Cir.1986); *United States v. Muskovsky,* 863 F.2d 1319, 1327–

28 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989).

Defendants move to dismiss the indictment on grounds of outrageous government conduct. As has been often repeated, the Seventh Circuit has yet to reverse a conviction on such grounds. *See United States v. Miller,* 891 F.2d 1265, 1267 (7th Cir.1989); *United States v. Sababu,* 891 F.2d 1308, 1326 (7th Cir.1989). "[D]ue process grants wide leeway to law enforcement agencies in their investigation of crime. Assuming that no independent constitutional right has been violated, governmental conduct must be truly outrageous before due process will prevent conviction of defendant." *Id.* at 1327 (quoting *United States v. Kaminski,* 703 F.2d 1004, 1009 (7th Cir.1983)). Furthermore:

It is well established that "the fact that officers of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). "The use of informants and the offer of a reasonable inducement are proper means of investigating crime." *Kaminski,* 703 F.2d at 1004. Indeed, "it may be safely said that investigative officers and agents may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process or evoke the exercise by the courts of their supervisory powers so as to deny to the officers the fruits of their misconduct." *Kaminski,* 703 F.2d at 1009 (quoting *United States v. Quinn,* 543 F.2d 640, 648 (8th Cir.1976)).

*Id.* at 1327–28.

■ Defendants argue their case is different from those the Seventh Circuit declined to reverse because there is no evidence defendants were otherwise involved in currency violations and because of the government's extensive involvement in soliciting the violations. Defendants, however, provide no allegations as to the par-

ticular involvement of any defendant other than Keller. They refer to the government undercover agent pressuring an employee or employees to not report the currency transactions, but do not identify the employee nor indicate whether he or she was one of those indicted. Also, the government alleges more than just passive involvement on the part of Keller. In any event, the facts alleged by defendants are not found to be that "truly outrageous" situation requiring dismissal of the indictment.

### Motions to Vacate Forfeiture Restraining Order

Defendants Keller and Edward Franco have moved to dismiss the forfeiture allegations and vacate the restraining order that prevents them from selling their interests in the currency exchanges that they own in part. To the extent these motions are based on the indictment's purportedly deficient enterprise allegations, those arguments must be rejected since, as discussed above, the indictment contains sufficient allegations of a RICO enterprise. The allegations of the indictment support forfeiture of each defendant's interests in his currency exchanges pursuant to 18 U.S.C. § 1963(a)(2)(A). Defendants also argue that the forfeitures violate the Eighth Amendment because the punishment is disproportionate to the crime and because due process requires a pretrial hearing.

■■■ The restraining order is not punishment. It is a restraint on the transfer of property without notice pending the outcome of litigation. Therefore, regardless of the merits of defendants' Eighth Amendment argument as related to any actual punishment resulting from the forfeiture, possible Eighth Amendment violations cannot directly constitute a basis for vacating the restraining order. All defendants can raise at the present time is the question of whether a hearing is required as to the propriety of the restraining order.[10] The government correctly argues

that the statute does not require a hearing. The question, though, is whether constitutional due process requires such a hearing. A number of circuits have held that probable cause shown by an indictment is not a sufficient basis, by itself, for permitting a restraint on property to continue. *United States v. Harvey*, 814 F.2d 905, 928 (4th Cir.1987), *modified in part on other grounds, In re Forfeiture Hearing as to Caplin & Drysdale, Chartered*, 837 F.2d 637 (4th Cir.1988) (*in banc*), *aff'd, sub nom., Caplin & Drysdale, Chartered v. United States*, —— U.S. ——, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); *United States v. Crozier*, 777 F.2d 1376, 1383–84 (9th Cir.1985); *United States v. Lewis*, 759 F.2d 1316, 1324–25 (8th Cir.), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985). *See also United States v. Bissell*, 866 F.2d 1343, 1349 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 146, 213, 107 L.Ed.2d 104 (1989). The government cites no case holding to the contrary. The government, therefore, cannot rely on the indictment alone.

■■■ In determining the precise process due, "the risk of an erroneous deprivation, the [government's] interest in providing specific procedures and the strength of the individual's interest" must be balanced. *Harvey*, 814 F.2d at 928 (quoting *Crozier*, 777 F.2d at 1383). Here, neither Keller nor Franco has pointed to any particular harm caused by the restraining order. Neither claims that the functioning of their businesses has been harmed and neither claims they have a need, or intention, to sell any of their interests in the exchanges. The lack of any harm is relevant to what the government needs to show to justify the continuation of the restraining order. Under such circumstances, a showing of probable cause that defendants committed the alleged crime and that the restrained property could be forfeited is sufficient.

■■ While the grand jury's finding of probable cause can be considered, it is not conclusive. Where, however, defendants point to no material factual dispute as to

---

10. However, whether forfeiture of certain property clearly would be prohibited by the Eighth Amendment would presumably be a factor to

consider in determining if the restraining order is overbroad.

the existence of probable cause, there is no need to conduct an evidentiary hearing. *Cf. Jackson v. Fair*, 846 F.2d 811, 819 (1st Cir.1988); *Commerce Park at DFW Freeport v. Mardian Construction Co.*, 729 F.2d 334, 340 (5th Cir.1984); *International Paper Co. v. Inhabitants of Jay*, 672 F.Supp. 29, 32–33 (D.Me.1987); *Sugarhill Records, Ltd. v. Motown Record Corp.*, 570 F.Supp. 1217, 1221–22 (S.D.N.Y.1983); *Scott & Fetzer Co. v. McCarty*, 450 F.Supp. 274, 277 n. 4 (N.D.Ohio 1977).[11] This is especially appropriate to consider since Congress did not establish a heightened standard for forfeiture. The various submissions of the parties do not indicate a possibility that the government cannot show probable cause to believe Franco and Keller committed RICO violations and that the exchanges were part of the RICO enterprise subject to forfeiture under § 1963(a)(2)(A). Defendants argument that the scope of § 1963(a)(2)(A) violates the Eighth Amendment is also of no avail. Defendants only point to the income derived from the currency violations alleged in the indictment and the purported discrepancy between those amounts and the value of the exchanges. Defendants fail to point to any evidence of other factors that would also have to be taken into account in determining if forfeiture of the exchanges would be unconstitutionally disproportionate to the alleged crimes. *See United States v. Busher*, 817 F.2d 1409, 1415 (9th Cir.1987). Defendants' motions to vacate the restraining orders are denied.

### Instructions to the Grand Jury

In the January 5 order, this court discussed the question of providing defendants with the instructions given to the grand jury by the prosecutors in this case. It was held that some showing on defendants' part was required for such an order. Defendants argued disclosure of the instructions was justified because inadequate allegations of a RICO enterprise indicated the grand jury may have been misinstructed. Today's ruling, however, finds the enterprise allegations to be sufficient. Defendants' motion will be denied.

### Motions to Suppress

Certain defendants seek to suppress statements given to IRS agents who interviewed them. An evidentiary hearing was held regarding interviews of Keller. Defendants Brotman, Carl Franco, and Sonshine entered into stipulations of fact with the government.[12] Waitzman presents no stipulation, affidavits, or evidence. None of the defendants were in custody when questioned.

IRS agents interviewed Mark Brotman at the Atlanta currency exchange where he worked. The agents identified themselves and told Brotman they wanted to ask questions about transactions of Jones, Jordan, and DePaulo, all of whom were undercover agents. Brotman was not informed of the true identity of the undercover agents. Brotman was not given *Miranda* or administrative warnings.[13] Brotman was not told he was a subject or target of a grand jury investigation nor did he ask if he was. Brotman did not recall the names of or recognize the pictures of the undercover agents he was questioned about. He answered other questions regarding the business and the filing of CTR's. The agents interviewed him for about an hour, left for 25 minutes, then returned. Brotman was then questioned as to why his records were inconsistent with what the questioning agents knew about transactions with the undercover agents. Brotman answered, "I

---

**11.** The cited cases all involve hearings pursuant to Fed.R.Civ.P. 65, the Rule that *Harvey*, 814 F.2d at 928, and *Crozier*, 777 F.2d at 1384, suggest as a model for pretrial hearings on forfeiture.

**12.** The government, relying on a statement of the court at the time of Keller's hearing, argues defendants cannot adopt the suppression motions of other defendants. That statement was made in the context of no individualized facts being submitted by defendants. Facts as to each defendant are now presented and the facts are similar for most defendants. Under those circumstances, legal arguments of a codefendant can be adopted.

**13.** The term "administrative warnings" will be used to refer to the requirements of Internal Revenue Manual ("I.R.M.") ¶ 342.132.

don't know why I didn't record the sale of the money orders. I just did it that way." When asked why he generally did not file the required CTR forms, he stated "they are just too much trouble to fill out."

IRS agents telephoned Carl Franco and identified themselves; Franco agreed to speak to them at an Atlanta currency exchange where he worked. The agents told Franco they were investigating Jones, Jordan, and DePaulo, without informing Franco that they were actually undercover agents. Franco said he did not know these men, but then recognized a picture of Jones. He answered various questions about Jones and the currency exchange. Franco was served with a grand jury subpoena and continued to answer questions. Agent Moss then accused Franco of lying and informed Franco he was a subject, but not the focus, of a grand jury investigation, that he was not under arrest, and that his cooperation was being sought. Franco stated, "I think I need an attorney" and questioning was discontinued. The questioning agents, however, gave Franco copies of transcripts of recorded conversations with the undercover agents and Franco voluntarily continued the conversation. The agents eventually requested that Franco engage in a consensually monitored conversation with Keller. He agreed to do so, changed his mind, then again agreed to do so at a federal office. At the federal office, he was given a "Waiver of Rights to Remain Silent and of Right to Advice of Counsel" form to read while agent Moss read from his "Right Card." Franco decided not to sign the form and not to call Keller. Franco answered more questions while being driven back to the currency exchange.

IRS agents went to interview Mark Sonshine at an Indianapolis currency exchange he managed. Sonshine was not there, but responded to a page and agreed to come to the exchange to be interviewed. The agents had identified themselves and had told Sonshine they wanted to ask questions about transactions of some individuals at a couple of the businesses he managed. Sonshine was not given *Miranda* or administrative warnings. Sonshine was not told he was a subject or target of a grand jury investigation nor did he ask if he was. Sonshine answered various questions regarding the business and the filing of CTR's. He did not recall Jones, Jordan, or DePaulo and stated he never conducted large cash transactions with persons going by that name. When asked if he conducted a $120,000 currency transaction with an individual in January 1989, he answered, "No." Agent Todd then served a grand jury subpoena on him. Sonshine continued to answer questions. When asked a more detailed question about the January transaction, Sonshine "just shrugged his shoulders and said nothing." After further questioning about the transaction, he responded, "I already told you my answer. I don't know anything about it." Later that day, the agents went to Sonshine's residence where he agreed to answer more questions. The agents confronted Sonshine with transcripts of taped conversations with Jordan and he continued to respond to questions about the January transaction and his earlier denials. At one point Sonshine "said he believe[d] he should talk to someone before answering any questions about it right then, to which TODD told him he had the right not to answer any questions if he did not want to, and further that SONSHINE may want to contact A.U.S.A. NEWMAN or even his own attorney." Agent Todd informed Sonshine he might have done something wrong and any attempt to further disguise the transaction could constitute another violation of the law. He also warned of possible conspiracy charges, but told Sonshine he was simply attempting to get Sonshine's voluntary cooperation in the investigation. Sonshine continued to answer questions about the business, but not about the January transaction.

Steven Waitzman filed a motion to suppress in which he recites certain facts, but without specificity. No stipulation of evidence has been submitted, nor any government memorandum of interview. Waitzman's and the government's briefs have been examined to determine if facts can be gleaned from Waitzman's recitation of

facts and any government concession in response. Sufficient facts cannot be derived from the briefs. Therefore, Waitzman's motion will be denied without further consideration.

As regards Keller, IRS Special Agent Clayton and Keller testified before the court. The following findings are made. Clayton was working under the direction of assistant United States attorney Newman on a grand jury investigation. On July 8, 1989, Clayton and another agent interviewed Keller at one of the exchanges Keller owns. Keller was not in custody. Newman had instructed Clayton to not inform Keller he was a target of the investigation unless Keller asked. Clayton told Keller he was in the IRS Criminal Investigation Division and was investigating Jones, Jordan, and DePaulo. At the time, Keller did not know the three were actually undercover agents. In accordance with instructions from Newman, Clayton did not advise Keller of his *Miranda* or administrative rights. Keller recognized a picture of Jones and answered questions about him and the business. During this initial interview, a grand jury subpoena was served on Keller. The agents questioned Keller for about an hour, then left to telephone Newman. Newman then instructed them to return for a second interview and reveal that Keller was a target and also reveal the true identity of the undercover agents. They were also to confront Keller with information contrary to his previous statements. The agents followed these instructions and also informed Keller his conversations with Jones were taped and that he was not under arrest. This is when Keller first became aware he was under investigation. Keller continued to answer questions for about another half hour. Keller eventually stated he had no more to say and the agents left shortly thereafter.

Keller, who has a college degree and substantial business interests, testified that he knows of the right to remain silent and the right to an attorney, but that he does not know the specifics of those rights. He testified he would have contacted an attorney and remained silent if specifically advised of those rights during the July 8 interview. He testified that he allowed the second interview to continue because he felt "compelled" to answer further questions after his statements in the first interview.

 Since none of the defendants were in custody, the IRS agents were not obliged to give *Miranda* warnings. *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Neither were administrative warnings required since the agents were not participating in an Internal Revenue Service investigation but rather were acting under the direction of an assistant United States attorney in connection with a grand jury investigation.[14] *See* I.R.M. ¶ 342.132(10).

 To suppress the statements given in the interviews, it must be shown that, taking into account the totality of the circumstances, the statements were involuntary in that the defendants' wills were overborne. *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). Failure to reveal that the person being interviewed is the subject of the investigation is not, by itself, a ground for suppressing the statements obtained. *See United States v. Serlin*, 707 F.2d 953, 956–57 (7th Cir.1983). Defendants argue that the misrepresentations that Jones, Jordan, and DePaulo were the subjects of the investigation are grounds for suppressing the statements.[15] Misrepresentations are relevant to the voluntariness determination, but are not necessarily determinative and must be considered along with other evidence. *See Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969). The evidence before the court

**14.** No determination is made as to whether violating the I.R.M. could be a ground for suppressing statements.

**15.** This argument can only apply to Franco and Keller. The evidence regarding Brotman and

Sonshine only shows that the agents told them they wanted to ask questions about transactions of the undercover agents. There is no evidence the questioning agents said the undercover agents were the targets of the investigation.

does not show that any of the defendants' wills were overborne because of any representations regarding the undercover agents. No statement is suppressed because involuntary.[16]

### Santiago Proffer

Defendants' motion for a pretrial hearing on admissibility of co-conspirator statements is denied. The government shall submit its written *Santiago* proffer by February 16, 1990. Defendants shall file written objections, if any, to the government's proffer by February 22, 1990.

### Severance

Defendants have moved for severance. While each defendant moves for his or her own separate trial, the principal argument is to try Keller separate from the other defendants. Initially, certain grounds for severance have been mooted by rulings on other motions. The allegations of a RICO conspiracy have been found to be sufficient and the allegations regarding drugs have been stricken from the indictment. Defendants' argument that *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), requires severance has been mooted by the government's agreement not to use statements not in furtherance of the conspiracy that inculpate other defendants. Also, prior to trial, the government's *Santiago* proffer must be found to be sufficient. Additionally, Count 61 is not an adequate basis for severance. It alleges the same statements that are alleged to be part of a coverup; it does not bring new evidence into the case.

■■■■ In deciding a motion for severance, due deference must be given to the public interest in a joint trial, particularly one involving a conspiracy which may be proved against more than one defendant by the same evidence. *United States v. Williams*, 858 F.2d 1218, 1223 (7th Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989) (quoting *United States v. Moschiano*, 695 F.2d 236, 246

(7th Cir.1982), *cert. denied*, 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983)). "To prevail on a motion for severance, then, a defendant must establish such prejudice that a joint trial would be unfairly prejudicial. This is a heavy burden; a mere showing that a separate trial would result in a better chance of acquittal is not enough. Specifically, mutually antagonistic defenses mandate severance only when the acceptance of one party's defense precludes acquittal of the other." *Id.* at 1224. Defendants argue that Keller's defense, which may be that he did not understand the law regarding the filing of CTR's, may be inconsistent with defendants who will try to show Keller instructed them not to file CTR's. Those defenses, however, are not necessarily mutually inconsistent. *Cf. United States v. Bruun*, 809 F.2d 397, 407 (7th Cir.1987). Keller could have instructed the other defendants not to file CTR's without having an understanding of the law. Moreover, his claimed misunderstanding of the law could be argued to be consistent with such instructions. Defendants have not made a sufficient showing of mutually antagonistic defenses to justify severance.

■■■■ Defendants also argue severance is required because, whereas Keller is involved in most of the transactions alleged in the indictment, the other defendants are only involved in one or a few transactions. Defendants argue the jury would be confused by the evidence and unable to consider, as regards each individual defendant, only that evidence admissible against that defendant. "That evidence adduced against co-conspirators might have been greater than that adduced against the defendant does not of itself constitute grounds for severance." *Sababu*, at 1331. Furthermore, the disparity is not as great as claimed since most of the evidence is admissible against each defendant on the conspiracy charge. *See id.* Moreover, it is presumed that the jury will follow limiting instructions and that it can and will sort

---

**16.** As is discussed elsewhere, certain statements of *Keller* are inadmissible to the extent they would be offered to prove a § 1001 charge.

Also, as already discussed, the "exculpatory no" doctrine is not being applied other than to the § 1001 charge against Keller.

out evidence where possible. *United States v. Studley*, 892 F.2d 518, 524 (7th Cir.1989) (quoting *United States v. Diaz*, 876 F.2d 1344, 1357 (7th Cir.1989)). Here, each currency count involves specific transactions represented by specific money orders. It is well within the jury's ability to sort out such evidence. The motions for severance are denied.

IT IS THEREFORE ORDERED that:

(1) Defendants' motion to dismiss and to strike portions of the indictment is granted in part and denied in part. The motion is denied to the extent it seeks to dismiss any count. Paragraphs 13(A)(vii), 13(A)(viii), and 13(B) of Count One and paragraphs 3(A), 3(E), 3(G), and 3(H) of Count 61 shall be stricken from the indictment. The motion is denied without prejudice as regards striking the references to 18 U.S.C. § 1962(d) in the 31 U.S.C. § 5322(b) counts.

(2) Defendants' motion to strike is denied as moot.

(3) Defendants' joint motion to dismiss Count One of the indictment alleging a RICO conspiracy on grounds of impermissible vagueness is denied.

(4) Waitzman's motion to dismiss Count One of the indictment because the RICO enterprise element is unconstitutionally vague is denied.

(5) Certain defendants' motion to dismiss Travel Act counts and to strike other references to that act is denied.

(6) Defendants' motion to dismiss the indictment because of the government's misconduct in the institution of this prosecution is denied.

(7) Keller's and Edward Franco's motions to dismiss forfeiture and vacate restraining order are denied.

(8) Defendants' motion for disclosure of instructions to the grand jury is denied.

(9) Keller's, Waitzman's, Sonshine's, Brotman's, and Carl Franco's motions to suppress are denied.

(10) Defendants' motion for pretrial hearing on admissibility of co-conspirator's statements is denied. The government shall submit its written *Santiago* proffer by February 16, 1990. Defendants shall file written objections, if any, to the proffer by February 22, 1990.

(11) Keller's motion for severance, defendants' motion to sever, and Sonshine's motion for Rule 8(b) and Rule 14 severance are denied.

(12) Status hearing set for February 22, 1990 at 2:00 p.m.